**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KENNETH B. PITCHER, et al.,                    Case No. 1:11-cv-148

              Plaintiffs,                    Weber, J.
    v.                                              Bowman, M.J.

LAWRENCE WALDMAN, et al.,

              Defendants.


**REPORT AND RECOMMENDATION**

The discovery deadline in this civil case recently expired, and the parties have filed cross-motions for summary judgment. Trial is presently set for the July 2013 term before U.S. District Judge Herman J. Weber. (Doc. 89). However, all matters pending trial, including the cross-motions for summary judgment, have been referred to the undersigned magistrate judge for initial consideration. (Doc. 61). For the reasons that follow, I recommend that the parties' cross-motions for summary judgment be denied, with the exception of Defendants' motion relating to punitive damages.

**I. Background**

Much of the background of this case has been previously set forth in several orders relating to discovery disputes, (*see* Docs. 20, 24, 37, 40), but greater detail is included in this Report and Recommendation. For purposes of the pending cross-motions, only those facts designated as undisputed by the parties in their respective

1

Proposed Findings (Docs. 77, 80) have been accepted by the Court.

The two Plaintiffs in this case, Kenneth Pitcher and Michael Enders, previously worked together with individual Defendant Larry Waldman in a professional accounting firm known as Waldman, Pitcher and Co., C.P.A's P.S.C. ("WP & Co."). The acrimonious breakup of that firm has generated a number of lawsuits between the parties, only three of which are detailed herein.[1] The first suit was filed by Plaintiffs in Kentucky state court against Defendants. Plaintiffs' state court Complaint accused Defendant Waldman of overbilling clients of WP & Co., and sought a judicial dissolution of the parties' original accounting firm on that basis.

The Kentucky lawsuit ultimately was resolved through an October 22, 2009 Settlement and Stock Redemption Agreement ("Settlement Agreement"). Through the Settlement Agreement, the parties dissolved the original firm, divided client lists, and formed new accounting firms. Defendant Waldman & Company CPA's, P.S.C., ("Waldman & Co.") continued operation as the successor company to WP & Co. Plaintiffs' new firm was called KPE Services, Inc.[2]

Under a section of the Settlement Agreement captioned "Transition Matters," Defendants agreed to assign accounts receivable and work-in-process attributable to certain clients to KPE Services, Inc. Plaintiffs agreed to indemnify Defendants "for any additional payroll taxes, including interest and penalties" incurred as a result of the

---

[1] In addition to the lawsuits detailed herein, Plaintiffs indicate that Waldman has filed whistleblower lawsuits against them, and has sought a civil protection order against Pitcher.

[2] Plaintiffs' firm subsequently changed its name to Pitcher, Enders & Drohan, CPAs, Inc.

2

assignment of accounts receivable and work-in-process to KPE Services.  The Settlement Agreement required Plaintiffs to dismiss the Kentucky lawsuit, and to relinquish stock in the original company, WP & Co.  Defendants were also required to pay $60,000 to the law firm of Greenebaum, Doll, and McDonald PLLC ("GDM"), which represented Plaintiffs in connection with the dissolution proceedings.  Defendant Waldman & Co. subsequently issued a 1099 form to GDM for the payment of attorneys' fees.

Plaintiffs' shares amounted to a 41% ownership interest in WP & Co.  Under a section captioned "Redemption of Shares by Company," the Settlement Agreement specified that "the Company [WP & Co.] shall pay Pitcher a purchase price in the amount of $833.00 for the Pitcher Shares and shall pay Enders the amount of $500.00 for the Enders Shares upon the execution of this Agreement."  (Doc. 45, Exhibit A, at 2, ¶ 1.4).

Three months after dissolving WP & Co., in January 2010, Defendant Waldman issued 1099-MISC forms to Plaintiffs, reflecting non-employee compensation in the amounts of $111,535 (to Pitcher) and $13,260 (to Enders) for the 2009 tax year, in amounts equal to the accounts receivable referenced in the Settlement Agreement. Plaintiffs took immediate exception to the issuance of the 1099-MISC forms, to the extent that the forms reflected compensation to them personally.  Plaintiffs posited that the assignment was income to KPE Services, such that they should not be personally responsible for paying taxes on the assigned accounts.  Plaintiffs subsequently filed complaints with the IRS Office of Professional Responsibility, the Ohio Accountancy

3

Board, and the Ohio Society of CPAs, accusing Defendant Waldman of wrongdoing in issuing the 1099-MISC forms.

On May 21, 2010, Waldman filed suit against the Plaintiffs in Hamilton County, Ohio.[3]  In his Ohio complaint, Defendant Waldman alleged multiple breaches of the October 22, 2009 Settlement Agreement,[4] as well as tortious conduct in connection with Plaintiffs' communications with the IRS and the Ohio Accountancy Board.  Plaintiffs filed a counterclaim for breach of contract and breach of fiduciary duty, based in part upon the issuance of the 1099-MISC forms.[5]

In connection with the Ohio lawsuit and IRS inquiry, Defendant Waldman hired a tax expert, Howard L. Richshafer.   Mr. Richshafer opined that the accounts receivable and work-in-process assigned to KPE Services, Inc. were properly taxable as income to Pitcher and Enders personally, but that the income should have been reported on W-2s as employment compensation rather than on 1099-MISC forms.  In determining the amount of reportable compensation, Richshafer additionally opined that the $60,000.00 payment of attorneys' fees, made by Defendants to GDM, should be taxed as a constructive compensatory benefit to Pitcher.  Richshafer also included, as income to Pitcher, the sum of $27,755.00, which had been paid by Defendants to KPE Services

---

[3] Even though Defendant Waldman initiated the Ohio lawsuit, in light of his role in this federal lawsuit and in order to avoid unnecessary confusion, he is referred to solely as "Defendant."  For the same reasons, Pitcher and Enders are referred to solely as "Plaintiffs."

[4] Defendants alleged that Plaintiffs failed to make certain payments relating to a particular account, that Plaintiffs violated the confidentiality and non-disparagement provisions of the Settlement Agreement, and that Plaintiffs violated provisions relating to certain "due date monitoring software."

[5] Like Defendants' complaint, Plaintiffs' counterclaim included additional issues not relevant to the parties' dispute in this Court.

for amounts collected from October 6 until October 22, 2009 from certain clients.

In February 2011, Defendants issued corrected 1099 forms and corrected W-2 forms. The corrected 1099-MISC forms showed $0 in non-employee compensation to both Pitcher and Enders. Consistent with Richshafer's opinions, the corrected W-2 issued to Pitcher added $199,290 in wages, including the $111,535 previously reported on the 1099-MISC form, plus the sums of $60,000 in attorneys' fees and $27,755 that Waldman & Co. paid to KPE Services. The corrected W-2 issued to Enders similarly included $13,260 that previously was reported on the 1099-MISC form. Defendant Waldman & Co. received a tax benefit from the issuance of the W-2s, to the extent that the payment of wages is tax-deductible.

Plaintiffs hired their own tax expert, Lynn Nichols, who agreed that the accounts receivable and work-in-process are taxable to Pitcher and Enders personally. Nichols testified that if Plaintiffs did not include those amounts on their personal tax returns, that was a "mistake."[6] However, in an important distinction from Defendants' position, Nichols opined that the assigned amounts were taxable as capital gains, rather than as employment income/wages. Capital gains are subject to a significantly lower tax rate than is ordinary income, including wages. Nichols also disagreed with Richshafer concerning the $60,000 payment of attorney's fees, opining that the attorney's fee payment was "either not taxable to [Pitcher] at all, only partially taxable since shares of both Pitcher and Enders were redeemed, or if taxable to either [Pitcher or Enders],

---

[6] Nichols provided this testimony in his deposition. (See Doc. 77 at ¶42). The deposition does not appear to have been filed in the record, but the testimony is undisputed.

additional consideration for redemption of their shares in the company."  Both Plaintiffs are currently being audited by the IRS to determine whether they are subject to additional taxes on the amounts reported on the amended W-2s.

The instant federal litigation parallels the second state court case, to the extent that a critical issue relates to Defendants' issuance of tax forms in 2010 and 2011, and their motivation in issuing those forms.  In the Ohio state case, the issue arose in the context of Waldman and Waldman & Co.'s claim for indemnification of payroll taxes under the Settlement Agreement.  Seeking summary judgment on their state court claim, Defendants argued that they were required to pay taxes to the IRS once they issued the contested W-2 forms.  Denying summary judgment, the Ohio court noted that both parties offered "differing expert opinions as to the appropriate tax treatment of the accounts receivable," but that [b]oth experts seemingly agree that the amounts should have been taxable to Pitcher and Enders individually."  (Doc. 50, Exh BB at 5).   The state court further explained that payroll taxes were only "actually…due and owing" if Richshafer's view were correct, and the payments were reportable as W-2 income.  On the other hand, if Nichols were correct, and the payments were really in the form of a stock redemption and therefore taxable only as capital gains, then no payroll taxes would have been due and owing, and the indemnity provision of the Settlement Agreement would not apply.  Viewing the opinions of the two experts (with Richshafer claiming that the W-2s were properly issued, and Nichols claiming that they were not), the state court found that "genuine disputes of material fact [exist] that preclude summary judgment." (*Id.* at 6).   The Ohio case eventually proceeded to trial, but settled

after the third day, on February 7, 2012.

Plaintiffs filed this federal case on March 9, 2011, while the Ohio case was still pending.  Instead of being based upon alleged breaches of the Settlement Agreement and tort claims under state law, this federal case is limited to a single claim that Defendant Waldman and Waldman & Co willfully filed fraudulent information returns in violation of a federal tax statute, 26 U.S.C. § 7434.  Plaintiffs assert that both the 2010 and 2011 forms falsely characterized certain payments as ordinary "income" to them.

The federal statute on which Plaintiffs' federal suit is based provides:

(a) In general

If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return.

26 U.S.C. §7434.

Plaintiffs' complaint alleges that, motivated by "hostility" and "spite and hatred," Defendants intentionally and in bad faith issued false tax forms in January 2010 and in February 2011 "in an effort to trigger additional tax liability on the part of Plaintiffs and to gain leverage over Plaintiffs related to ongoing disputes among the parties."  (Doc. 1, ¶¶16, 23, 30, 36).  Plaintiffs seek compensatory and punitive damages, and attorneys' fees.

## II. Analysis

## A. Summary Judgment Standard

In considering a motion for summary judgment, "a court must view the facts and

any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007)(internal quotation marks and additional citations omitted).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c), internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the nonmoving party, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations.  "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986).  The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255 (emphasis added).

Although reasonable inferences must be drawn in favor of the opposing party, inferences are not to be drawn out of thin air.  *Matsushita Elec. Indus. Co., Ltd.   v.*

8

*Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* (additional citation omitted).

As explained below, genuine issues of material fact remain in this case, largely precluding summary judgment to either party.  Only the issue of punitive damages can be resolved, because that is an issue of law that does not require resolution of disputed facts.  Although oral argument was requested by Plaintiffs, the factual disputes in this case are so stark that the Court finds no benefit would be served by hearing oral argument.

### B.  Cross-Motions for Summary Judgment On Plaintiffs' Fraud Claim

To establish a claim of tax fraud under 26 U.S.C. §7434, Plaintiffs must prove: (1) that the Defendants issued "information returns"; (2) that the information returns were fraudulent; and (3) that Defendants willfully issued fraudulent returns.  "As with any variety of civil fraud, each element of tax fraud must be shown by clear and convincing evidence."  *Cavato v. Hayes*, 2010 WL 2679973 *4 (N.D. Ill. July 1, 2010),[7] citing *Granado v. Comm'r of Internal Revenue*, 792 F.2d 91, 94 (7th Cir. 1986); *see also Richardson v. Comm'r of Internal Revenue*, 509 F.3d 736 (6th Cir. 2007)(holding that

---

[7] Ironically, although *Cavato* is cited and relied upon by both parties, the Seventh Circuit set aside its reasoning when, in affirming the judgment, it noted that the 1099-C form at issue in that case is not an "information return" within the meaning of 26 U.S.C. §7434.  See *Cavato v. Hayes*, 634 F.3d 921, 924 (7th Cir. 2011).  Nevertheless, both because of the scarcity of relevant case law, and the soundness of *Cavato*'s analysis on the second and third elements of a claim under §7434, this Court also finds it to be persuasive.

Commissioner bears burden of proving fraudulent intent by clear and convincing evidence, in order to support civil penalty for fraud). Even if the burden of proof were the less rigorous preponderance of evidence, neither party would be entitled to summary judgment, because disputed issues of fact remain regarding the second and third elements of Plaintiffs' claim.

### 1. The Defendants Issued Information Returns

Only the first element is undisputed. The parties agree that the 1099 forms issued in 2010, as well as the corrected 1099 forms and corrected W-2 forms issued by Defendants in 2011, are "information returns" within the meaning of the statute. Therefore, Plaintiffs have satisfied the first element of their claim.

### 2. Issues of Fact Remain As to Whether the Returns Were Fraudulent

The second element of a §7434 claim requires Plaintiffs to establish that the returns were "fraudulent." Proof of fraud requires intentional error.

> As a general matter, tax fraud requires "intentional wrongdoing," *see Granado v. Comm'r of Internal Revenue*, 792 F.2d 91, 92–93 (7th Cir.1986), and essential to that intent is "some element of concealment or deception." *Zell v. C.I.R.*, 763 F.2d 1139, 1144 (10th Cir.1985). Evidence of tax fraud may therefore consist of "any conduct, the likely effect of which would be to mislead or to conceal." *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943). ….A mere "error or mistake" in filing an information return does not establish fraud under § 7434. *See Jacobs v. Ocwen Fed. Bank, FSB*, 311 F. Supp.2d 766, 769 (N.D.Ind.2004).

*Cavoto v. Hayes*, 2010 WL 2679973 at *4.

On the record presented, although Plaintiffs can establish error in the filing of the 1099-MISC forms in 2010, they cannot establish that the error amounted to fraud.

10

Plaintiffs gain even less traction concerning the filing of the corrected 1099-MISC forms and W-2 forms in 2011, because they cannot presently establish the existence of error, much less fraud. Conversely, Defendants' cross-motion for summary judgment must be denied, because Defendants cannot establish either that no error exists, or that any error was indisputably made in good faith.

In an attempt to bring clarity to the issues presented, the Court will first discuss the filing of the 1099-MISC forms in 2010, before turning to the W-2 forms filed in 2011. After discussing issues unique to each of those separate filings, the Court will address evidence and arguments that pertain to both sets of information returns.

### a. The 1099-MISC forms filed in 2010

Plaintiffs have established that the 1099-MISC forms issued in January 2010 were incorrect. Defendants' subsequent issuance of corrected forms in 2011 confirms that fact, as does Defendant Waldman's deposition testimony in state court. (Doc. 45, Exhibit Q, Waldman's deposition at 485). Plaintiffs proceed to argue that the erroneous issuance of the 1099-MISC forms in 2010 was necessarily fraudulent. Defendants protest that the fact that the information returns contained errors does *not* mean that they were "fraudulent," since the term "fraudulent" has always meant something more than a mere mistake.

In support of a finding that he made an honest mistake, Defendant Waldman has testified that he issued the 1099-MISC forms, assigning income to Pitcher and Enders, based upon his legal duty to report income to the IRS. Waldman testified in his state court deposition that he issued 1099-MISC forms for "non-employee" compensation,

11

based upon his belief that the payments were in the nature of deferred compensation, but made at a time when Plaintiffs were no longer employees. (*Id.* at 52-53).

Defendant also points out that after Plaintiffs complained to the IRS Office of Professional Responsibility, the Accountancy Board of Ohio, and to The Ohio Society of CPAs Professional Ethics Committee, all three professional entities opened investigations, but subsequently closed those investigations with no findings of wrongdoing concerning his filing of the 1099-MISC forms in 2010. On August 30, 2010, the Director of the Officer of Professional Responsibility with the IRS wrote to Defendant Waldman, describing Plaintiffs' allegation "that you mailed Mr. Pitcher and Mr. Enders Form 1099-MISC containing information that you knew to be false," but concluding that after investigation, she "accept[ed] your explanation as provided," and was "resolving any area of doubt in your favor" in her "final disposition of the inquiry." (Doc. 50, Exh. S). On September 7, 2010, the Accountancy Board of Ohio wrote Defendants that it had also completed its investigation, which "did not disclose reasonable and substantial evidence of any violation of Chapter 4701 of the Ohio Revised Code." (*Id.* at Exh. T). Last, on January 5, 2011, the Ohio Society of CPAs Professional Ethics Committee wrote Defendant Waldman that it "has decided to take no further action in this matter." (*Id.*, Exh. U). Defendants suggest that because none of these three organizations found that Defendant Waldman had engaged in intentionally false conduct, this Court should likewise conclude, as a matter of law, that Defendants acted in "good faith" and therefore are entitled to summary judgment.

It would be the rare case where a party's intent to defraud could be proven by

12

direct rather than circumstantial evidence.  This is not that rare case; all of the evidence regarding Waldman's intent in filing the 1099-MISC forms in 2010 is circumstantial. While Waldman cites his testimony and investigations of independent organizations as supporting his "good faith" mistake, Plaintiffs cite other evidence to support their view that Waldman's intentions were more nefarious.  As discussed below, because the evidence is susceptible to more than one reasonable interpretation, summary judgment cannot be granted to either party.

### b. The W-2 Forms Filed in 2011

Unlike the 1099-MISC forms issued in 2010, Plaintiffs have failed to submit clear evidence that any errors at all exist concerning the filing in 2011 of corrected 1099 forms and corrected W-2 forms.  Thus, not only is the issue of fraudulent intent in dispute, but even the issue of mistake or error is disputed.  Defendants' expert has opined that the issuance of the W-2 forms was correct, because the payments were wages; Plaintiffs' expert disagrees, opining that the payments were reportable only as capital gains.

Plaintiffs argue strenuously that Defendants' expert's position is "untenable." However, the differing viewpoints of the parties (and their experts) defines the genuine issue of material fact that remains in dispute.   The Ohio state court, reviewing a similar issue (whether the accounts receivable were W-2 income or a capital gain) came to a similar conclusion, finding a genuine issue of material fact that precluded summary judgment.  (Doc. 50, Exh. BB at 6).  The fact that the IRS audits of Plaintiffs have not yet concluded adds to the ambiguity of this issue.  Depending on the Commissioner's

final classification of the various payments, Plaintiffs may or may not be able to establish error in the issuance of the W-2s.

Plaintiffs attempt to get around this disputed issue by arguing that even Richshafer concedes that any payments under the Settlement Agreement, up to the fair market value of Plaintiffs' shares, constitute a redemption of shares, for which issuance of W-2s would be incorrect.  Plaintiffs point to evidence that the fair market value of WP & Co. in October 2009 was between approximately 1.49 and 2.48 million dollars.  Under that valuation, Plaintiffs' 41% ownership necessarily exceeded the nominal figures of $833 and $500 stated as the share value in the Settlement Agreement.  However, this Court's review of the referenced pages of Richshafer's deposition testimony does not find complete agreement with Plaintiffs' position.  Rather, Richshafer holds fast to his opinion that the value of the shares for tax purposes was the amount agreed upon in the Settlement Agreement.  His deposition testimony confirms his opinion that issuance of the W-2s was correct, and that the additional payments were deferred compensation rather than capital gains, based upon the listed value of the shares in the parties' Agreement.  (*See e.g.*, Doc. 45, Exh. S, Richshafer federal deposition at 19-21).

Richshafer's opinion that the shares were worth the nominal amount stated in the Settlement Agreement strengthens Defendants' position that the payments were reportable on W-2s as wages.  Plaintiffs complain that Richshafer's opinion is unsupported.  However, in addition to being supported by the value stated in the parties' Settlement Agreement, Defendants note that Enders stated $500.00 as the sale price of his shares on his 2009 tax return, and that Pitcher did not list any value for the sale of

14

his shares on Schedule D of his 2009 tax return. Defendants contend that if the shares had a much higher value as Plaintiffs' expert opines, then Plaintiffs' personal tax returns should have reflected that higher share value. Given the conflicting evidence and expert opinions, this issue is not susceptible to resolution on summary judgment.

### c. Evidence Applicable to Both 1099-MISC and W-2 forms

Even if errors in the filing of W-2 forms could be proven at this juncture, I would recommend denial of summary judgment based upon conflicts in the evidence as to whether the errors were "fraudulent." Earlier in this opinion, the Court referred to Waldman's state court testimony that he made no more than an honest mistake in filing 1099-MISC forms in 2010. In contrast, Plaintiffs suggest that the requisite element of deceit should be inferred because Waldman's issuance of 1099-MISC forms in 2010, as well as his issuance of the W-2s, conflicted with the terms of the Settlement Agreement. The Settlement Agreement specified that the payments were to be made directly to KPE Services (for accounts receivable and work-in-process), and to GDM, the law firm (for the attorneys' fees). Indeed, Defendants wrote checks to KPE Services and GDM, and not to Plaintiffs directly, in accordance with the Settlement Agreement.

Despite Plaintiffs' belief, the fact that the Settlement Agreement specified that the checks were to be made to KPE Services and/or GDM rather than Plaintiffs personally is not clear evidence that the information returns were "fraudulent." The tax code cannot be altered by private parties. As noted by the Ohio court, the Settlement Agreement did not purport to alter the tax code, because it specified only to whom payment was to be made. The Agreement was completely silent as to the tax treatment

15

of the various payments.[8]   Indeed, Plaintiffs' own expert now concedes that the accounts receivable payments were taxable to Pitcher and Enders personally (a fact not avoided by payment to KPE Services), even though Nichols opines that the taxes owed would be assessed at the lower capital gains rate.

Plaintiffs next argue that the 1099-MISC forms and subsequently corrected W-2s were "fraudulent" based upon their expert's opinion that no W-2s or 1099s should have been issued at all, because all of the transactions resulting from the October 2009 Settlement Agreement relate strictly to the redemption of shares in WP & Co.  Based upon the value of WP & Co. and Nichols' opinions, Plaintiffs maintain that all of the payments constituted capital gains, and not "income" that could be reported either on the 1099-MISC forms or on the W-2 forms.

In contrast, Defendants' expert opines that IRS rules mandated Defendants to report all of the income (including the accounts receivable and attorney's fees paid in connection with the transactions) to Plaintiffs on some form of 1099 and/or W-2. According to Richshafer, Defendants faced civil penalties for failing to report the income.  If Defendant Waldman was motivated by his good faith belief that he was legally required to file the returns, then any error was made in good faith, and not fraudulent.

Plaintiffs insist that it makes no sense that Defendants would have issued 1099-

---

[8] Undermining Plaintiffs' argument, the Ohio court granted summary judgment to Waldman and Waldman & Co. on the claim of Pitcher and Enders that the mere issuance of the 1099 forms in 2010 breached the terms of the Settlement Agreement.  Because the Settlement Agreement was silent as to the tax treatment of the payments, there was no breach.  (Doc. 50, Exh. BB at 6).

MISC forms for *non*-employee income, to the extent that Defendants assert that they believed in 2010 that the accounts receivable payments were employee compensation. But Waldman has offered testimony, as has his expert, that the issuance of the 1099-MISC forms was an honest mistake, not a malevolent one.

Plaintiffs also dismiss Defendants' "legal duty to report" argument, based upon Plaintiffs' expert's view that no reporting is required for *redemption of shares*.  However, Plaintiffs do not dispute that reporting is legally required for compensation.

Plaintiffs assert that given Waldman's expertise as a CPA, and his experience with 1099 and W-2s, he could not have made a "mistake" but must have intentionally issued fraudulent returns.  To the contrary, it is evident from the number of published cases concerning issues of how income should be characterized, as well as from the differing opinions of the parties' experts and ongoing IRS audits, that the characterization of the payments was not so clear cut that Waldman could not possibly have made a mistake in good faith.

In short, proof of an error is not tantamount to proof of fraud.  Because the facts presented are susceptible to differing interpretations, both concerning whether any error was made by filing W-2 forms and whether any of the alleged errors were "fraudulent," summary judgment must be denied.

### 3. Issues of Fact Remain on Whether Defendants Acted "Willfully"

Summary judgment also must be denied based upon factual disputes concerning the third element of a claim brought under §7434 - whether Defendants "willfully" issued fraudulent returns.  The issue of willfulness, like proof of a "fraudulent" error, is closely

17

tied to proof of Waldman's intent. Courts have interpreted the term "willfully" as requiring "proof of deceitfulness or bad faith in connection with filing an information return." *Cavoto v. Hayes*, 2010 WL 2679973 at *4.

Plaintiffs argue that Defendants' explanation for issuing the 1099-MISC in January 2010 is not believable or credible, given the timing of the issuance of those forms (shortly after other post-Settlement Agreement disputes arose), Waldman's antagonism toward Plaintiffs, his underlying knowledge of the tax code, and of the harmful consequences that his "mistakes" would cause Plaintiffs. In addition, Waldman admittedly learned not later than May 2010 that the 1099-MISC forms were incorrect, but waited until February 2011 before issuing corrected information returns. That delay, according to Plaintiffs, is itself evidence of Waldman's bad faith.

However, Waldman explains that the delay was merely due to the need to wait for Richshafer's opinion, not for any other reason. In any event, the statute requires the filing of fraudulent returns to be willful at the time of issuance. The statute does not penalize delay in filing corrected returns. *See Rossman v. Lazarus*, 2008 WL 4181195 at *11 (E.D. Va. Sept. 3, 2008)("the statute applies only when an entity makes a 'filing,'" and not when an entity fails to file).

Defendants urge the Court to grant summary judgment on the basis that "[t]here is simply no evidence to suggest that Waldman filed the original 1099s, the amended 1099s or the amended W-2s at issue in bad faith or in an effort to deceive the IRS" (Doc. 50 at 15). Defendants are correct that there is no *direct* evidence. However, Defendants are not entitled to summary judgment because a reasonable fact-finder

18

could draw the inference, based upon the timing of Waldman's filing of 1099 forms in 2010, the historical animosity between the parties, and the subsequent acknowledgment of error and issuance of corrected 1099s, that Defendants did act in bad faith in issuing some (if not all) of the information returns.   This is not to say that this Court finds bad faith, but only that the circumstantial evidence presented supports two plausible interpretations of Waldman's motive.

Defendants have offered alternate explanations, explaining that IRS regulations drove the timing of the 1099-MISC filing in 2010, and not any ongoing dispute between the parties.  Defendants also have offered evidence that Waldman and his tax attorney at the time, Robert Brant, believed in October 2009 that the accounts receivable would be taxable to Plaintiffs personally, and requested the indemnity provision in the Settlement Agreement for that reason.   Again, genuine issues of material fact concerning Waldman's intent preclude summary judgment.

### C.  Summary Judgment Should Be Granted on Punitive Damages

Although summary judgment is not appropriate in light of the stark factual disputes presented on two of the three elements of Plaintiffs' claim under §7434, Defendants' cross-motion also seeks judgment in their favor on the issue of punitive damages.

With respect to the issue of damages, the statute provides:

(b)  In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the greater of $5,000 or the sum of –

(1) any actual damages sustained by the plaintiff as a proximate

19

result of the filing of the fraudulent information return (including any costs attributable to resolving deficiencies asserted as a result of such filing),

> (2) the costs of the action, and

> (3) in the court's discretion, reasonable attorneys' fees.

26 U.S.C. §7434(b).  Plaintiffs argue that punitive damages also should be permitted

Because the statute provides a specific compensatory remedy that does not include punitive damages, Plaintiffs are not entitled to recover such damages as a matter of law.  *See United States v. Orlando*, 281 F.3d 586 (6th Cir. 2002)("Where Congress has provided a particular remedy for the violation of a statute, that remedy, and not judicially imposed remedies, should apply in the absence of a constitutional violation.").  As another district court reasoned, rejecting a claim for punitive damages under a different statute:

> The Supreme Court has cautioned that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *TransAmerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979). The Supreme Court stated recently that where Congress has crafted an enforcement scheme for rights created by statute, no extra damages are available. *See Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3094, 87 L.Ed.2d 96 (1985) (disallowing claim for punitive damages under ERISA).

*Finnan v. L.F. Rothschild & Co., Inc.*, 726 F. Supp. 460, 464-65 (S.D.N.Y. 1989)(disallowing clam for punitive damages under WARN Act); *see also generally, Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (6th Cir. 1996)(*en banc*, citing *Transamerica* to hold that punitive damages are not available under §504 of the Rehabilitation Act).

20

In this case, a claim under §7434 requires Plaintiffs to prove willfulness and/or bad faith in issuing "fraudulent" returns – the same elements typically required to prove entitlement to punitive damages. In listing the remedies, Congress is assumed to have made the deliberate choice not to include punitive damages. *United States v. Ware*, 161 F.3d 414, 424 (6th Cir. 1998)("[C]ourts should presume that Congress has engaged in the necessary balancing of interests to determine the appropriate penalty."). By comparison, other provisions of the tax code that provide for a private right of action and civil damages for unauthorized inspection or disclosure of sensitive tax information also expressly provide for punitive damages. *Compare* 26 U.S.C. §7431(c). Therefore, Defendants' motion for summary judgment on the issue of punitive damages should be granted.

### III. Conclusions and Recommendations

For the reasons discussed above, **IT IS RECOMMENDED THAT** Plaintiffs' motion for summary judgment (Doc. 45) be **DENIED**. **IT IS FURTHER RECOMMENDED THAT** Defendants' cross-motion for summary judgment (Doc. 50) be **GRANTED** solely with respect to the issue of punitive damages, which are not recoverable under 26 U.S.C. §7434. In all other respects, Defendants' motion also should be **DENIED**.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KENNETH B. PITCHER, et al.,                      Case No. 1:11-cv-148

               Plaintiffs,                      Weber, J.

    v.                                                    Bowman, M.J.

LAWRENCE WALDMAN, et al.,

               Defendants.

### NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).